UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Kelly Ruddock,

    Plaintiff,

v.                                                              Case No. 07-13558

Southgate Automotive, Inc.,            Honorable Sean F. Cox
doing business as Southgate Ford,

    Defendant.
_____/

## **OPINION & ORDER**

On June 4, 2008, Plaintiff filed this action against her former employer asserting claims of sexual harassment, retaliation, and intentional infliction of emotional distress. The matter is currently before the Court on Defendant's Motion for Summary Judgment. The issues have been fully briefed by the parties and the Court heard oral argument on August 21, 2008. At the August 21, 2008 hearing, Plaintiff's counsel agreed that Plaintiff's quid pro quo claims (Counts II and IV) should be dismissed. Thus, the Court need only analyze Defendant's Summary Judgment Motion as it relates to the remaining claims. For the reasons that follow, the Court shall DENY the motion.

### BACKGROUND

Plaintiff Kelly Ruddock ("Ruddock") filed this action against Defendant Southgate Automotive, Inc. d/b/a Southgate Ford ("Defendant" or "Southgate") on August 23, 2007. Plaintiff's complaint asserts the following claims: "Hostile Work Environment Sexual Harassment under Federal Law" (Count I); "Plaintiff's Claim of Quid Pro Quo Sexual

1

Harassment Under Federal Law" (Count II); "Plaintiff's Claim of Hostile Work Environment Sexual Harassment Under State Law" (Count III); "Plaintiff's Claim of Quid Pro Quo Sexual Harassment Under State Law" (Count IV); "Retaliation in Violation of State Law" (Count V); "Retaliation in Violation of Federal Law" (Count VI); and "Intentional Infliction of Emotional Distress" (Count VII).

Following discovery, Southgate filed the instant Motion for Summary Judgment on June 4, 2008.

Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In keeping with this standard, below is a summary of the evidence submitted by the parties, viewed in the light most favorable to Plaintiff, the non-moving party.

Plaintiff began her employment with Southgate in July 2001. (Compl. at ¶ 3; Def.'s Br. at 2). At all times relevant to this action, Plaintiff was employed as a "service advisor" or "service writer." (*Id.*). Bob Lovett ("Lovett") was the Service Director that oversaw Plaintiff's department and Michael Oben ("Oben") is the president and owner of Southgate. (Pl.'s Compl. at ¶ 3). Prior to January 12, 2006, Mark Plegue ("Plegue") was Plaintiff's immediate supervisor.

At all relevant times, Southgate had an anti-harassment policy that stated, in pertinent part:

> If you feel that you are being harassed by another employee, you should immediately notify your supervisor. If you do not feel that the matter can be

> discussed with your supervisor, you should contact the General Manager or the
> President and arrange for a meeting to discuss your complaint. You may be
> assured that you will not be penalized in any way for reporting a harassment
> problem.

(Ex. 10 to Def.'s Br.).

Events Prior to January 12, 2006:

Plaintiff claims that she suffered severe and pervasive sexual harassment while employed at Southgate that began when she started and became worse after she had breast augmentation surgery on August 1, 2005. (Pl.'s Dep. at 35). She claims the harassment was mainly from three sources: 1) Plegue, her immediate supervisor; 2) Lovett, Plegue's supervisor; and 3) a co-worker named "Lou." In support of her allegations, Plaintiff submits, among other things, an affidavit and her deposition testimony.

During her deposition, Plaintiff's testified that:

- On at least ten occasions at work, Plegue asked Plaintiff to have sex with him. He made these comments in the service department and in the presence of others, including Lovett. (Pl.'s Dep. at 25-28);

- While at work, Plegue would tell Plaintiff that she "made him horny." (*Id*. at 25-31);

- Plaintiff's co-worker, Lou, would physically grab Plaintiff's butt while at work and touch her. (*Id*. at 29-30);

- Lou would also ask Plaintiff "how the twins were doing," referring to Plaintiff's breasts, and would continuously tell Plaintiff how great she looked and how nice of a body she had. (*Id.* at 29-30);

- Lovett would constantly make comments to Plaintiff about her butt. (*Id*. at 31);

- Both Plegue and Lovell would make comments to Plaintiff about her breasts, telling her how nice her breasts were, asking if they could see them, asking her if her back hurt and if they got in the way, etc. (*Id*. at 33-36). Plaintiff testified that they made these comments to her on a frequent basis, "at least twice a week." (*Id*.);

- On one occasion while at work in July or August of 2005, Lovett grabbed Plaintiff's shirt

3

to look down her shirt and ripped Plaintiff's shirt. (*Id*. at 38-40); and

- Lovett would ask Plaintiff for back rubs in exchange for vacation time or assistance with a customer. (*Id*. at 30-32).

Plaintiff's affidavit, submitted in opposition to Defendant's Motion for Summary Judgment, states, among other things, that:

2. In 2005, my supervisor, Mark Plegue would ask me at work to have sex with him on work premises and after work. On one occasion, he asked me to 'get wild with him.' He also asked me to spend a weekend with him out of town. I told him no on every occasion. After I would tell him no, he would tell me that he could really work his stuff. I told him that he was gross. Plegue was probably twice my age at that time and I had no interest in him sexually or otherwise. I told him that he was a dirty old man.

3. For the entire period that I worked in the service department until January 2006, Plegue would view pornography on his work computer. He would often call other employees over to view the pornography. On several occasions, Plegue asked me to come over to his work area. When I got there, he would have the pornography on his computer. He asked me if I liked it. When the pornography displayed sexual acts, he asked me whether I have performed those acts. He also would ask if I would perform those acts on him. I would tell him no and that he was gross.

4. Bob Lovett would join in and watch the pornography on Mark's computer. He did not tell Mark to stop it or turn it off.

5. On several occasions, I was awarded a "top performer" award for my job performance. A top performer plaque was on the wall behind my desk in the service department with my name on it. Mark would take the plaque and rub it on his genitals. He would tell me that " I make him so horny" and "I was making him so hard." Bob was present when Mark did this. I told Mark to stop it.

6. When Lou would touch my butt, I told him to knock it off. When he made comments about my breasts and butt, I told him to stop it.

7. Mark made statements at work that I participated in sexual acts with him. Bob was present. Bob did not do anything other than to ask me if they were true. They were not true and I told Bob that they were not true. He did not say anything to Mark.

4

(Plaintiff's Affidavit).

Plaintiff testified that she told both Plegue and Lovett to stop when they engaged in inappropriate behavior towards her. (Pl.'s Dep. at 33-40). Plaintiff testified that she verbally complained about Lou's behavior to Lovett and another supervisor, Joan Bevak ("Bevak"), approximately 20 times. (Pl.'s Dep. at 30, Ex. 8 to Plaintiff's Br. at 5). Plaintiff states that she also complained to Lovett and Bevak about Plegue and his pornographic material. (Pl.'s Ex. 8 at 9).

Plaintiff testified that she had heard from others in the service department not to go above Lovett with any complaints because he would "get very mad about it." She further testified that after a co-worker named Tammy Shepherd went to Oben with a complaint, Lovett stopped talking to her and would not help her when she needed assistance at work. (Pl.'s Dep. at 36-38).

In his affidavit, Plegue denies making "the majority of the comments alleged" by Plaintiff, but admits to "speaking to [Plaintiff] at times utilizing sexual phrases or innuendos." (Plegue Affidavit at ¶ 4).

During his deposition, Lovett admitted that he probably made comments about Plaintiff's butt, and specifically recalled that he "told her she had a fat ass." (Lovett Dep. at 50-51). When asked if he had asked Plaintiff to give him back rubs while at work, Lovett responded that he "[m]ight have asked for a shoulder rub once in a while." (*Id*. at 82).

Lovett also testified that, at some point in time, viewing of pornography and other web sites that employees should not be viewing was "rampant throughout the dealership." (Lovett Dep. at 46-48). Lovett testified that he saw Plegue view pornographic material on his computer on more than one occasion. Lovett states that he told Plegue to "get rid of it" on more than one

5

occasion, but never formally disciplined him. (*Id*.).

The January 12, 2006 Incidents And Events That Followed:

It is undisputed that on January 12, 2006, Norm Walikangas ("Walikangas"), one of Southgate's service technician's, physically threatened Plaintiff when she approached him to discuss an issue with a customer. Walikangas testified that he told Plaintiff he "was going to smoke her in the mouth if she didn't go back up front." (Walikangas Dep. at 5). There is nothing in the record to indicate that Plaintiff did anything to provoke Walikangas, who testified that he was just "having a bad day." (*Id*. at 6). Plaintiff verbally reported the incident to both Lovett and Oben that same day. (Def.'s Br. at 2). Lovett disciplined Walikangas that same day, sending him home without pay.

Later that same night, Plegue called Kendall Roush ("Roush"), Plaintiff's fiancee, on the telephone after work hours. Southgate acknowledges that Plegue "had been drinking and was admittedly out of line." (Def.'s Br. at 2). Roush testified that Plegue threatened him during that call and made statements to the effect that he and Plaintiff needed to let the situation with Walikangas go. (Roush Dep. at 22-24). It is undisputed that during this call, Plegue told Roush that Plegue had seen Plaintiff's breasts, had pictures of Plaintiff's breasts, and that more than one of his co-workers had such pictures. (Roush Dep. at 24-35; Def.'s Br. at 2). Roush taped the conversation using an accessory on his cellular phone. (*Id*.).

Plaintiff's affidavit indicates that she went to Lovett's office the next morning and complained about Plegue's behavior, telling Lovett that Plegue had threatened Roush and made the comments about her breasts. (Plaintiff's Affidavit at ¶ 9). She further states that:

> I told Bob [Lovett] that I had recorded portions of the conversation. I told Bob
> that I could no longer work with Mark. Mark came into the office. Mark denied

6

> the comments. Mark began to raise his voice toward me and called me a "baby" for complaining to Bob. I told Mark that I was not going to argue with him. I did not raise my voice during this meeting or argue with Mark. I was sent home for the remainder of the day without pay.

(*Id.*).

Lovett testified that he sent both Plegue and Plaintiff home, stating that they continued arguing after he told them to stop. (Lovett Dep. at 56).

Oben testified that Lovett came to see him on Friday, January 13, 2006, and told him that Plaintiff "had gotten into a shouting match with Mark Plegue," that was "concerning a call that Mr. Plegue had made to her and Kendall Roush." (Oben Dep. at 37). He further testified as follows:

> Q. Do you remember any more detail about that conversation?
> A. Well, I didn't hear the conversation.
> Q. No, no, no. between you and Mr. Lovett.
> A. The conversation was Mr. Lovett informed me that he had sent them both home for the day and thought a cooling off period over the weekend would be appropriate. This had been the second conflict [Plaintiff] had gotten in within two days, and, you know, Mark Plegue was somehow involved in it at this stage, so he felt cooling off would be the best idea and give them both the day off.

(Oben Dep. at 37-38).

Written notes taken by Oben also reflect that Lovett told him that Plegue had threatened Roush, but make no mention of the statements Plegue made about having pictures of Plaintiff's breasts. (Pl.'s Ex. 10 at 1).

The next Monday, January 16, 2006, Plaintiff went to see Oben and submitted a written statement indicating that she wished to make a formal sexual harassment complaint against Plegue. (Pl.'s Ex. 11; Plaintiff's Dep. at 46-51). Plaintiff testified that after she submitted the complaint, Oben immediately fired her, telling her that she was being fired because she "couldn't

7

get along with people." (*Id.*).

Oben's notes reflect that when he met with Plaintiff on July 16th, Plaintiff gave him a written sexual harassment complaint and stated that she did not feel that she could work for Plegue. Oben's notes then state:

> I told her she was terminated and a brief conversation was had on why I would take that action. I told her she was an at will employee and as such I could terminate anyone at anytime for any or no reason. I told her that her arguments with employees the last few days were part of the cause. She asked if [Plegue] and [Walikangas] were to be employed and I told her I would determine that. I told her my decision was final and told her to leave.

(Pl.'s Ex. 10).

Oben's notes reflect that Roush came to see him following Plaintiff's termination, played some recordings for him, and indicated that he had contacted the police to make a formal complaint against Plegue. (*Id.* at 4). The notes indicate that Oben told Roush that he would consider reinstating Plaintiff. They also state that after discussing the events with his attorney, he decided to reinstate Plaintiff and "open an investigation into the complaint she filed and see if she had reconsidered her position concerning working with [Plegue]."

Oben met with Plaintiff again on January 17, 2006, at which time he prepared several documents that he asked her to sign. (*See* Exs. 13, 14 & 15). One of the documents, Exhibit No. 13, advised Plaintiff that while she was being reinstated to her prior position with the same salary and benefits. However, the letter also stated that "this letter shall serve as a final warning with respect to your employment" and that if any "further violation" of Southgate's work rules "shall result in an immediate termination of your employment." (*Id.*). Plaintiff claims that prior to January 12, 2006, she had a clean disciplinary record at Southgate. A second letter advised Plaintiff that Southgate was going to investigate her for sexual harassment. (Exhibit 14).

8

Plaintiff also testified that she was treated differently after she made her written sexual harassment complaint. She claims that she no longer received constructive assistance from her supervisors and co-workers. For example, Plaintiff states that after her complaint, Lovett told her not to come to him anymore for assistance because they were "no longer friends" after she complained. (Pl.'s Affidavit at ¶ 20). She also claims that she was treated differently in terms of not having accounts assigned to her after a co-worker left, not being allowed to give free loaner vehicles to her customers, and being selectively disciplined for things such as taking long lunches, cell phone usage, etc. Plaintiff claims that these actions resulted in a decrease in her income. Plaintiff submitted her letter of resignation on August 30, 2006.

ANALYSIS

A.  Plaintiff's Retaliation Claims (Counts V & VI):

The parties agree that to establish a prima facie claim of retaliation, under Title VII and the ELCRA, Plaintiff must prove that: 1) she was engaged in protected activity; 2) Defendant had knowledge of that protected activity; 3) Defendant took an adverse action towards Plaintiff; and 4) that there was a causal connection between the protected activity and the adverse action. (Def.'s Br. at 7; Pl.'s Br. at 24).

Defendant acknowledges that Plaintiff can establish the first two elements, that Plaintiff engaged in protected activity and that Defendant was aware of that activity. Defendant contends that it is entitled to summary judgment with respect to Plaintiff's retaliation claim because she cannot establish the third and fourth elements, that Defendant took an adverse action against Plaintiff and that there was a causal connection between the protected activity and the adverse action. (Def.'s Br. at 7).

9

1. Adverse Action:

In its brief, Defendant focuses on whether or not Plaintiff can establish that she incurred interference with her job performance following her protected activity. Defendant's opening brief did not address Plaintiff's assertion that her firing and discipline in January 2006 constitute adverse actions that support a prima facie of retaliation.

Citing *Burlington Northern*, Plaintiff states that the standard for adverse employment actions for purposes of retaliation claims is substantially lower than that in other discrimination cases. Under *Burlington Northern*, Plaintiff claims that she must demonstrate only that a reasonable employee would have found the challenged action materially adverse. Plaintiff contends that she incurred retaliation in two distinct phases.

First, she contends that she was suspended, terminated, and severely disciplined in January, 2006, and that those actions constitute adverse employment actions for purposes of her retaliation claim.

Second, Plaintiff contends that she was retaliated against from January 2006, to August 2006, when she was constructively discharged. She contends that after she complained to management, her supervisors refused to assist her in her job duties, which caused a reduction in her wages. She claims she was also selectively disciplined.

In *Burlington Northern*, the Supreme Court held that "the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that solely affect the terms, conditions or status of employment, or only those acts that occur at the workplace. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008). "The retaliation provision instead protects employees from conduct that would have 'dissuaded a reasonable worker from

10

making or supporting a charge of discrimination.'" *Id*.

Here, Plaintiff had a clean disciplinary record at Southgate prior to January 12, 2006. Following her making a formal sexual harassment complaint to Oben on January 16, 2006, however, Plaintiff was terminated. Although she was later reinstated, she did not receive backpay for all the time she was off work. In addition, even after she was reinstated, her discipline was not removed. Rather, her termination was changed to a final warning stating that any further work rule violations would result in immediate termination. (*See* Ex. 13 to Pl.'s Br.). The Court concludes that these are actionable adverse actions and therefore Plaintiff has met the adverse action element of her prima facie case.

2. Causal Connection:

The Court also concludes that Plaintiff has met the causal connection element of her retaliation prima facie case. The Sixth Circuit recently confirmed that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Here, Plaintiff testified that she was terminated during the January 16, 2008 meeting with Oben -- immediately after making a formal sexual harassment claim. Thus, under *Mickey*, Plaintiff has met the causal connection element of her prima facie case of retaliation.

Accordingly, the Court shall deny Defendant's request for summary judgment as to Plaintiff's retaliation claims.

B. Plaintiff's Hostile Work Environment Claims (Counts I & III):

Plaintiff also asserts hostile work environment claims, which are based on sexual harassment. The parties agree that to establish a claim of hostile work environment, based upon sexual harassment, Plaintiff must establish that: 1) she was subjected to unwelcome sexual conduct or harassment; 2) the unwelcome sexual conduct or communication created a hostile work environment; and 3) employer liability. (Def.'s Br. at 13; Pl.'s Br. at 11-12).

In its motion, Defendant contends that it is entitled to summary judgment on Counts I & III because: 1) the conduct Plaintiff complains of was not unwelcomed or pervasive; and 2) Defendant cannot be held vicariously liable.

1. Unwelcomed & Pervasive

Defendant first argues that the evidence establishes that the conduct Plaintiff complains of was neither unwelcomed nor pervasive. Defendant bases its argument on deposition testimony and affidavits from several of Defendant's employees, wherein they assert that Plaintiff frequently engaged in "sexual banter" and other conduct at the workplace and that they did not personally see her sexually harassed at work. (*See e.g.*, Affidavits of Wendy Clark, Michelle Crace, and Brent Crumpton, attached to Def.'s Br. as Exs. 19, 20 & 21). These affidavits also contain other statements by these employees, such as "It is my opinion that [Plaintiff] was not bothered by sexual discussion at work" (Ex. 19 at ¶ 3) and "[Plaintiff] was very open about her breast augmentation surgery and would walk around as if she was very proud of her new breasts." (Ex. 20 at ¶ 6).

Plaintiff notes that this Court must view the evidence in the light most favorable to Plaintiff and that, as such, the subjective opinions of her co-workers must be disregarded for purposes of this motion. Plaintiff contends that, based upon the conflicting testimony, whether

the harassment was unwelcome or pervasive is a question of fact for the jury.

The Court agrees. "The question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986). "The correct inquiry is whether [Plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome." *Id.*

Here, Plaintiff testified that she told both Plegue and Lovett, her supervisors, to stop when they engaged in inappropriate behavior towards her. (Pl.'s Dep. at 33-40). She testified that she also verbally complained about Lou's behavior to Lovett and another supervisor, Joan Bevak ("Bevak"), approximately 20 times (Pl.'s Dep. at 30, Ex. 8 to Plaintiff's Br. at 5) and that she also verbally complained to Lovett and Bevak about Plegue viewing pornographic material. (Pl.'s Ex. 8 at 9). It is also undisputed that Plaintiff filed a formal written sexual harassment complaint with Oben on January 16, 2008. Based upon this evidence, the Court concludes that, with respect to the issue of whether the conduct complained of was unwelcome, Plaintiff has presented sufficient evidence to create a genuine issue of material fact for the jury.

The Court further concludes that Plaintiff's testimony, if believed by the jury, is sufficient to establish that the conduct was pervasive.

An actionable claim for hostile work environment based upon sexual harassment occurs when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To determine whether a work environment is hostile or abusive, the court looks to the totality of the

circumstances. *Id.*

"[T]he totality of the circumstances test mandates that district courts consider harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment." *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). "Moreover, the totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile work environment, the accumulated effect of such incidents" may result in a hostile work environment. *Id.* at 563.

Here, Plaintiff's work environment at Southgate included all of the following:

- On at least ten occasions at work, having Plegue ask her, in front of Lovett and others, to have sex with him. (Pl.'s Dep. at 25-28).

- While at work, having Plegue tell her that she "made him horny." (*Id.* at 25-31);

- Having Plegue call her fiancee, after work hours, and tell him that he had pictures of her breasts and that several of her other co-workers had such pictures, which was untrue. (Undisputed);

- Having her co-worker, Lou, physically grab her butt while at work and otherwise touch her. (*Id.* at 29-30);

- Having Lou repeatedly ask her "how the twins were doing," referring to her breasts, and having him continuously tell her how great she looked and how nice of a body she had. (*Id.* at 29-30);

- Having Lovett constantly make comments to her about her butt. (*Id.* at 31);

- Having both Plegue and Lovell make comments to Plaintiff about her breasts, at least twice a week, telling her how nice her breasts were, asking if they could see them, asking her if her back hurt and if they got in the way, etc. (*Id.* at 33-36);

- On one occasion, having Lovett physically grab her shirt to look down her shirt, and ultimately ripping her shirt. (*Id.* at 38-40);

- Having Lovett ask her for back or shoulder rubs in exchange for vacation time or assistance with a customer. (*Id.* at 30-32; Lovett Dep. at 82);

14

- Having Lovett tell Plaintiff that she had a fat ass. (Lovett Dep. at 50-51);

- Having Plegue speak to her "utilizing sexual phrases or innuendos." (Plegue Affidavit at ¶ 4);

- Having Plegue call Plaintiff over to his work area while he was looking at pornography, and asking her if she had performed various sex acts before and asking her if she would perform various sex acts on him. (Pl.'s Affidavit);

- Having Plegue remove her "top performer" award from the wall behind her desk and rub it on his genitals, while telling her that she made "him so horny" and was "making him so hard." (*Id.*); and

- Having Plegue make untrue statements to others at work that she had participated in sexual acts with him. (*Id.*)

"These incidents, which must be taken as fact for purposes of summary judgment, were not merely crude, offensive, and humiliating, but also contained [incidents] of physical invasion." *Williams, supra*. The Court concludes that, viewing the evidence in the light most favorable to Plaintiff, and viewing the incidents in their entirety and in their proper context, a reasonable jury could conclude that Plaintiff was subjected to a hostile work environment.

  2. <u>Vicarious Liability</u>

For purposes of establishing vicarious liability, Title VII and the ELCRA have different standards. *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999); *Chambers v. Trettco, Inc.*, 463 Mich. 297, 312-13 (2000); *Vredevelt v. Geo Group, Inc.*, 145 Fed.Appx. 122, 134 n.3 (6th Cir. 2005).

    a. <u>Title VII</u>

Plaintiff seeks to hold her employer liable for harassment by both co-workers (Lou) and supervisors (Plegue and Lovett).

Under Title VII, "[e]mployer liability for co-worker harassment is based directly on the

15

employer's conduct." *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999). "An employer is liable if it 'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Id.*

"In contrast, employer liability for supervisor harassment is vicarious" and the Supreme Court has adopted the following standard:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed.R. Civ.P. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.* (Citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

With respect to the alleged harassment by her co-worker Lou, Plaintiff testified that she verbally complained about Lou's behavior to Lovett and another supervisor, Joan Bevak ("Bevak"), approximately 20 times. (Pl.'s Dep. at 30, Ex. 8 to Plaintiff's Br. at 5). Thus, a reasonable jury could conclude that Southgate knew of the charged sexual harassment and failed to implement prompt and appropriate corrective action.

With respect to the alleged harassment by supervisors Plegue and Lovett, Southgate contends that it is entitled to summary judgment because the evidence shows that Southgate has established its *Faragher* defense.

Plaintiff first responds that a *Faragher* defense is not even available because the sexual harassment here did result in a tangible employment action. Plaintiff states that it is undisputed that: 1) Plegue made sexually harassing comments on January 12, 2006, 2) she reported the

16

incident to Lovett, who then suspended her for the rest of the day; and 3) after she made a formal complaint to Oben, he fired her that same day. She further states the final disciplinary warning was never removed and she was not given backpay. Thus, she states that the sexual harassment resulted in three tangible employment actions: her suspension, termination and last and final warning status.

Plaintiff also contends that, even no tangible employment action had occurred, there would be a question of fact as to whether, among other things, the employer exercised reasonable care to prevent and correct promptly the sexual harassment.

This Court agrees that, even if no tangible employment action had been taken, Plaintiff has shown a genuine issue of material fact as to employer liability for the alleged harassing behavior by Plegue and Lovett and failure to exercise reasonable care to prevent and promptly correct the behavior. Southgate's harassment policy instructed employees to notify their supervisor about harassment. Plaintiff testified that both Plegue and Lovett participated in, and were obviously aware of, the harassment and that she verbally complained to both of them to stop the inappropriate behavior. Plaintiff also testified that she verbally complained to another supervisor, Bevak. Plaintiff also testified that she went directly to Oben with a written sexual harassment complaint and that, despite Southgate's policy statement to employees assuring them that they "will not be penalized in any way for reporting a harassment problem," Oben immediately fired her after she filed the complaint with him. Accordingly, the Court concludes that a reasonable jury could conclude that the employer's response did not constitute "prompt and appropriate corrective action."

      b.     ELCRA

In *Chambers*, the Michigan Supreme Court held that liability for a hostile work environment "can only be attributed to the employer if the employer failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment." *Chambers*, 463 Mich. at 313. "Thus, an employer may avoid liability for a claim of sexual harassment if it does not have actual or constructive notice of the alleged harassment." *Vredevelt, supra*, at 134. "The employee gives the employer actual notice if she complains about the harassment to higher management." *Id*.

Defendant's brief focuses on the fact that Plaintiff did not file a *written* sexual harassment complaint until January 2006. Plaintiff, however, has submitted evidence to establish that she *verbally* complained to three supervisors (Plegue, Lovett and Bevac) on multiple occasions and that despite those complaints, the challenged conduct continued.

Accordingly, the Court also finds that an issue of fact exists as to employer liability under the ELCRA.

C.  <u>Plaintiff's Intentional Infliction of Emotional Distress Claim (Count VII)</u>:

Under Michigan law, to state a claim for intentional infliction of emotional distress, the plaintiff must allege extreme or outrageous conduct which, intentionally or recklessly, causes extreme emotional distress. *Garretson v. City of Madison Heights*, 407 F.3d 789, 799 (6th Cir. 2005). Liability will not be found for mere insults, indignities or minor annoyances. *Id*. Rather, liability has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and would "arouse the resentment of an average member of the community against the actor, leading him to exclaim, 'Outrageous!'" *Id.*

18

The distinction between conduct which might lead one to exclaim "outrageous," and that which is not actionable, is key. It is generally the duty of the trial court to determine whether a defendant's alleged conduct may reasonably be regarded as so "outrageous" and where reasonable minds may differ, the question is for the jury. *Id.*

Here, Defendant contends that the Court should dismiss Plaintiff's Emotional Distress claim because "the facts of this case do not rise to the level of intentional emotional distress." (Def.'s Br. at 23). Defendant does not cite any analogous cases, however, wherein a court has dismissed an intentional infliction of emotional distress claim under facts similar to those alleged by Plaintiff.

The Court concludes that Plaintiff has submitted evidence that, taken collectively, creates a genuine issue of material fact as to whether the challenged conduct is sufficient to establish the requisite extreme and outrageous conduct. *See e.g., Akers v. Alvey*, 338 F.3d 491, 496 (6th Cir. 2003)(finding issue of fact as to whether conduct was sufficiently outrageous under Kentucky law).

Accordingly, the Court shall deny Defendant's request for summary judgment as to Plaintiff's claim for intentional infliction of emotional distress.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Plaintiff's quid pro quo claims (Counts II & IV) are hereby DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

                                s/Sean F. Cox  
                                Sean F. Cox  
                                United States District Judge

Dated: September 11, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 11, 2008, by electronic and/or ordinary mail.

                                s/Jennifer Hernandez  
                                Case Manager